The Cleveland City School District Board of Education appeals from the judgment of the Cuyahoga County Court of Common Pleas finding that the orders of the State Employment Relations Board ("SERB") regarding the unlawful termination of school board employee Timothy McPhillips are supported by substantial evidence and in accordance with law. The facts giving rise to this appeal are as follows.
On December 16, 1985, McPhillips was hired by the school district as a temporary garage mechanic at its Lake Center Bus Depot. The employees in the bargaining unit that includes the classification of garage mechanic were represented by Local 100 of the International Brotherhood of Firemen and *Page 507 
Oilers, AFL-CIO. A collective bargaining agreement between the union and the school district was in effect throughout the term of McPhillips's employment with the school district.
In December 1985, the maintenance operations of the school district's transportation system were managed by Director of Transportation Maintenance Michael Malloy. McPhillips's direct supervisors were Assistant Maintenance Manager James Sewell, head mechanic Barney Godfrey, and senior mechanic Donald Sheets. The bus drivers were supervised by a separate management team including Director of Transportation Operations Harry James and Assistant Depot Managers Juana Mendez and Ivor Gibson. Director of Transportation Operations James and Assistant Depot Managers Mendez and Gibson had no direct responsibility for supervising or directing McPhillips's work.
When McPhillips began working at the Lake Center Depot, his scheduled hours of work were from 7:00 a.m. to 3:30 p.m. Although the Director of Transportation had told McPhillips that overtime was voluntary, Assistant Maintenance Manager Sewell told McPhillips that he wanted him to experience the start-up shift. The start-up shift was an early morning shift from 4:30 a.m. to 7:00 a.m., made up of a reduced crew of drivers and mechanics who were responsible for starting approximately one hundred buses in order to have them ready for morning pickups. The start-up mechanics were primarily responsible for getting stalled buses started.
While on the start-up shift, McPhillips experienced great difficulty in carrying out orders because he began to receive contradictory instructions from the senior mechanics and the assistant maintenance managers. Within a very short period of time, McPhillips was told by Assistant Maintenance Manager Sewell that he was to remain on the lot until the buses were started and rolling, but after the buses were gone, he was to report to the garage, even if the start-up shift had not ended. When Assistant Depot Manager Mendez complained that mechanics were not on the lot when she needed them during the start-up shift, Sewell told McPhillips that he was to remain on the lot during the entire start-up shift. Shortly thereafter, two of McPhillips's direct supervisors, Godfrey and Sheets, told him he that he was needed in the garage and that he was to remain on the lot only until the buses were started and rolling, but that he was then to report to the garage even if it was before the start-up shift ended.
Additionally, the assistant depot managers often went directly to the mechanics with orders instead of relaying them through the mechanics' direct supervisor, as required by the collective bargaining agreement.[1] McPhillips had been told by *Page 508 
his immediate supervisor, Godfrey, not to perform certain maintenance functions such as seat and mirror adjustments and adding fluids. Godfrey told McPhillips that these functions were performed by the bus drivers. Nevertheless, the assistant depot managers often instructed McPhillips to perform these repair and maintenance functions.
As a result of such communication problems, McPhillips and Assistant Depot Manager Mendez had several confrontations. Mendez testified that many times when she asked McPhillips to perform a task, he would argue about the task and sometimes refuse to do the work. As an example, Mendez related one incident where she found McPhillips waiting in the parking lot in his car because the door to the maintenance building was locked. Mendez stated that when she questioned McPhillips as to why he did not come to her for the key, he replied that it was not his job to do that. Mendez also testified that McPhillips was often loud and abusive toward her. She claimed that on at least one occasion, McPhillips called her a "mother-f* * * *r." Mendez said she reported these incidents to Director of Transportation Operations James, who reported them to Director of Transportation Maintenance Malloy. Witnesses to confrontations between McPhillips and Mendez testified that they had never heard McPhillips use any profanity directed toward Mendez.
In mid-February 1986, a meeting of several mechanics, including McPhillips, and their supervisors was convened to discuss staff communication problems. During this meeting, McPhillips complained that he was often receiving contradictory orders from too many people during the start-up shift. McPhillips asked Sewell who his boss was and from whom he should be taking orders. According to McPhillips, Sewell told him he should do whatever anyone told him to do. At this point, McPhillips, who had been previously told by Transportation Director Malloy that overtime was voluntary, asked to be taken off the start-up shift. Sewell responded in a sarcastic manner that led McPhillips to believe that if he did not continue to work the start-up shift, he would be disciplined. Concerned about being disciplined and wanting clarification regarding his obligation to work the start-up shift, McPhillips requested that a union steward be brought into the meeting. Godfrey told McPhillips that it was not a disciplinary meeting and that a union representative was not necessary. Sewell told McPhillips that no union representative was available. McPhillips then asked to see a copy of the collective bargaining agreement, but was told by Sewell that he had no rights under the agreement until after he successfully completed his ninety-day probationary period. McPhillips then stated that at the conclusion of his ninety days, *Page 509 
he would settle his concerns through the contract procedures. After the meeting ended, Sewell told Godfrey, "If I'm going to have to contend with a problem after ninety days, I don't need it."
Shortly after this meeting, Sewell told Transportation Director Malloy that he and Mendez were having problems with McPhillips on the lot in the mornings and that he intended to recommend in his probationary report that McPhillips be removed from his position.
In his probationary report dated February 28, 1986, Sewell rated the quantity and quality of McPhillips's work "conditional" and his relationship with other employees and supervisors as "unsatisfactory." Sewell further stated in the report that McPhillips was "uncooperative with drivers and depot management, has shown he is unwilling to improve and has stated that he will be even less cooperative after probation." Sewell recommended that McPhillips be discharged because he had attitude problems. McPhillips did not participate in his evaluation.
Sewell submitted his probationary report to Malloy, who then requested written statements from Mendez and Godfrey regarding McPhillips's attitude. Since Sewell had been in his position for less than two months and had never done a probationary report, Malloy wanted to confirm Sewell's recommendations.
After Godfrey and Sheets learned that McPhillips was to be terminated, they approached Malloy and tried to convince him not to discharge McPhillips because they thought McPhillips was a good mechanic. In spite of these efforts, on March 14, 1986, upon the recommendation of Sewell, Malloy terminated McPhillips for unsatisfactory performance.
Malloy was not present at the February meeting, where McPhillips stated that he would resolve his concerns through the contract procedures at the end of his probationary period, and was unaware of McPhillips's requests for a union representative and a copy of the collective bargaining agreement.
On April 14, 1986, McPhillips filed an unfair labor practice charge with SERB against the school district, alleging that he had been terminated in violation of R.C. 4117.11(A)(1) and (A)(3) for demanding union representation and a copy of the collective bargaining agreement, and communicating his intent to enforce his rights under the collective bargaining agreement by filing grievances at the conclusion of his probationary period. Following the filing of these charges, SERB conducted an investigation and subsequently found probable cause to believe that the school district had committed an unfair labor practice. Accordingly, SERB ordered that a complaint issue against the school district alleging that it had fired McPhillips for engaging in protected activities. *Page 510 
Following a two-day hearing on the complaint, a SERB-designated hearing officer found that the school board had not violated R.C. 4117.11(A)(1) or (A)(3) and recommended that SERB dismiss the complaint. The hearing officer found that the preponderance of the evidence supported the school district's position that McPhillips had been terminated because he was an uncooperative employee. Pursuant to R.C. 4117.12, the Ohio Attorney General filed with SERB exceptions to the hearing officer's proposed order, citing errors of fact and law. On May 22, 1989, SERB issued its opinion, rejecting the proposed order of the hearing officer and finding that the school district's actions had been motivated at least "in part" by a desire to retaliate against McPhillips for engaging in protected activities. SERB ordered the school district to reinstate McPhillips to his position of garage mechanic, with full seniority rights and back pay.
On June 1, 1989, the school district filed an administrative appeal in the Cuyahoga County Court of Common Pleas, seeking to overturn the order of SERB. The school district argued that the conclusion of SERB was unsupported by the facts in the record. Moreover, on September 13, 1992, two years after it filed its notice of appeal, the school district, relying on the then recent decision of State Emp. Relations Bd. v. Fort Frye LocalSchool Dist. Bd. of Edn., SERB 91-005 (July 17, 1991), filed a motion for remand to SERB, arguing that SERB had employed an erroneous standard of legal causation to the facts of this case, thereby erroneously arriving at the conclusion that the actions of the school district were unlawful.
After reviewing the briefs of the parties, the common pleas court denied the school district's motion to remand and, on April 8, 1992, affirmed SERB's order reinstating McPhillips with full seniority rights and back pay. The court found that there was substantial evidence in the record to support SERB's order and that it was lawful in all respects.
The school district timely appealed, raising the following three assignments of error for our review:
"I. The court below erred in affirming the decision of the State Employment Relations Board which applied the `in part' test to a mixed motive claim of violation of Ohio Revised Code, Section 4117.12.
"II. The court below erred in affirming the decision of the State Employment Relations Board as that decision was unlawful and not supported by the record as a whole.
"III. The court below erred in not remanding the matter to the State Employment Relations Board to review under its `dual motive' test as detailed in Ft. Frye Local School District Boardof Education, Serb.Opn. No. 91-005 (7/17/91)." *Page 511 
 I
The school district's first and third assignments of error are related and will be considered together.
In its first assignment of error, the school district asserts that the trial court abused its discretion in affirming SERB's finding of an unfair labor practice under R.C. 4117.11(A)(1) and (A)(3) where SERB reached its conclusion using the "in part" test of In re Gallia-Jackson-Vinton Joint Vocational SchoolDist. Bd. of Edn., SERB 86-044 (Nov. 13, 1986), affirmed (Nov. 30, 1988), Gallia C.P. No. 86-CL-415, reported in (1989), SERB Official Reporter, an inappropriate legal standard. The "in part" test of Gallia-Jackson provides that if a disciplinary action is motivated at least in part by the protected activities of the employee, the discipline violates the prohibitions of R.C. Chapter 4117 even if a legitimate business reason was also relied upon.
More particularly, in its third assignment of error, the school district argues that during the pendency of its administrative appeal to the court of common pleas, SERB abandoned the "in part" test in favor of the National Labor Relations Board's "but for" test of causation and that the trial court should have remanded this matter to SERB for reconsideration in light of this change in policy. See In reFort Frye Local School Dist. Bd. of Edn., supra. In In re FortFrye, however, SERB specified that its adoption of the WrightLine "but for" test was to be given only prospective application: "[T]he applicable test for determining whether discrimination in violation of O.R.C. § 4117.11(A)(3) has occurred in mixed-motive cases is, from now on, the `but for' test as is laid out in the NLRB case of Wright Line." (Emphasis added.) Id., SERB 91-005 at 3-27.
Recently, in State Emp. Relations Bd. v. Adena Local SchoolDist. Bd. of Edn. (1993), 66 Ohio St.3d 485, 613 N.E.2d 605, the Ohio Supreme Court put to rest the debate over whether R.C. Chapter 4117 calls for the "in part" or the "but for" causation test. In Adena, the court expressly rejected SERB's adoption of the Wright Line "but for" test, characterizing it as misfocused, and held that for purposes of determining the motivation of an employer charged with an unfair labor practice, R.C. Chapter 4117 requires SERB to use the "in part" test. In depicting the allocation of proof of a Chapter 4117 unfair labor practice under the "in part" test as a "reasonable interpretation" of the statutory directive, the court further held that:
"* * * The proponent of the charge has the initial burden of showing that the action by the employer was taken to discriminate against the employee for the exercise of rights protected by R.C. Chapter 4117. Where the proponent meets this burden, a prima facie case is created which raises a presumption of antiunion animus. The employer is then given an opportunity to present evidence that its *Page 512 
actions were the result of other conduct by the employee not related to protected activity, to rebut the presumption. SERB then determines, by a preponderance of the evidence, whether a ULP has occurred."[2] Id. at 499, 613 N.E.2d at 615.
The court explained that:
"When the `in part' test is properly applied it results in a determination of the actual motive of the employer in taking the action. This approach allows SERB to consider the employee's work history, but only as circumstantial evidence of the employer's motivation, and not as a separate inquiry characterized as an affirmative defense. Thus, application of the `in part' test in this manner allows SERB, in resolving ULP charges, to focus on the important inquiry — the motivation of the employer. The problems associated with the `but for' test and its burden-shifting, wrongly focused, bifurcated inquiry are avoided.
"We realize that recognizing actual motivation to be a component of the `in part' test will not necessarily make SERB's task in determining employer motivation an easy one. SERB must still evaluate the evidence presented to determine if antiunion animus actually motivated the employer to take the action against the employee. However, we are confident that this causation analysis will allow SERB to comport more closely with the requirements of R.C. Chapter 4117 in resolving ULP cases."Id. at 499, 613 N.E.2d at 615.
In applying the preceding discussion to the facts of this case, we find that the trial court did not err in denying the school district's motion to remand or in applying the "in part" test to review SERB's order. At the time this case was decided by SERB, the "in part" test of In re Gallia was the approach used by SERB to resolve unfair labor practice charges. When SERB abandoned this approach and expressly adopted Wright Line's "but for" test (two years after the school district filed its administrative appeal to the court of common pleas), SERB stated that the "but for" test would be applied prospectively — that is, in cases where SERB had not issued a final order. In re FortFrye, supra. Given this directive from SERB, the trial court appropriately deferred to the Gallia-Jackson "in part" test. Accordingly, we overrule the school district's first and third assignments of error. *Page 513 
 II
In its second assignment of error, the school district contends that the trial court abused its discretion in affirming SERB's order finding that the school district had discharged McPhillips in violation of R.C. 4117.11(A)(1) and (A)(3), which the school district argues was not supported by substantial evidence. Specifically, the school district argues that the record does not establish a sufficient causal relationship between McPhillips's protected activities and his discharge.
In reviewing a determination by SERB that an unfair labor practice has occurred, a common pleas court must affirm SERB's finding with respect to the facts "if supported by substantial evidence, on the record as a whole." R.C. 4117.13(B). The role of an appellate court upon review of an administrative order is limited to a determination of whether the trial court has abused its discretion in the performance of its review functions.Lorain City Bd. of Edn. v. State Emp. Relations Bd. (1988),40 Ohio St.3d 257, 533 N.E.2d 264. An abuse of discretion "`implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.'" State ex rel.Commercial Lovelace Motor Freight, Inc. v. Lancaster (1986),22 Ohio St.3d 191, 193, 22 OBR 275, 277, 489 N.E.2d 288, 290. Absent an abuse of discretion on the part of the trial court, a court of appeals must affirm the trial court's judgment. SeeRohde v. Farmer (1970), 23 Ohio St.2d 82, 52 O.O.2d 376,262 N.E.2d 685. The fact that an appellate court may have arrived at a different conclusion than did SERB is immaterial. An appellate court may not substitute its judgment for that of the administrative agency or trial court absent a clear abuse of discretion. Lorain City Bd. of Edn. v. State Emp. Relations Bd.,supra.
The issue before SERB was whether the school district discharged McPhillips in violation of R.C. 4117.11(A)(1) and (A)(3).
R.C. 4117.11(A)(1) and (A)(3) provide in pertinent part that:
"It is an unfair labor practice for a public employer, its agents, or representatives to:
"(1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117. of the Revised Code or an employee organization in the selection of its representative for the purposes of collective bargaining or the adjustment of grievances;
"* * *
"(3) Discriminate in regard to hire or tenure of employment or any term or condition of employment on the basis of the exercise of rights guaranteed by Chapter 4117. of the Revised Code. * * *" *Page 514 
SERB concluded that in terminating McPhillips, the school district had, in fact, been motivated, at least in part, by antiunion animus. In its written opinion, SERB stated that:
"The facts of this case support the conclusion that McPhillips was terminated at least in part because he asked for union representation and a written statement of his rights, and for threatening that once he finished his ninety day probationary period he would file a grievance." In re ClevelandCity School Dist. Bd. of Edn., SERB 89-013 (May 19, 1989) at 3-82.
Upon review of SERB's order, the trial court determined that there was substantial evidence in the record to support this conclusion of SERB that the school district had terminated McPhillips's employment, at least in part, because of his union activities. We thus examine this decision of the trial court to determine if that court abused its discretion in finding that the record contained sufficient evidence of the school district's antiunion animus.
Since direct evidence of an employer's antiunion motivation is rarely available, proof of this element is typically indirect. Factors used by SERB to assess motivation include the employer's delay in taking disciplinary action after being apprised of employee misconduct, during which delay the employee engages in protected activity, see In re Adena Local SchoolDist. Bd. of Edn. SERB 89-034, (Dec. 29, 1989); the employer's departure from routine disciplinary procedure, see In re OhioDept. of Transp. SERB 87-020, (Oct. 8, 1987); the employer's failure to provide the employee with a written warning for misconduct prior to taking disciplinary action, see id.;
disciplinary action taken by the employer which immediately follows the employee's exercise of protected rights, see In reBelmont Cty. Engineer SERB 88-007, (July 5, 1988); explanations given by the public employer for the disciplinary action which shift and change, see In re Adena Local School Dist. Bd. ofEdn., supra; and the evidence of a pattern or plan of antiunion sentiment through the employer's conduct, see In re BelmontCounty Engineer, supra.
Upon review of the record in light of the above considerations, this court concludes that the trial court did not abuse its discretion in finding SERB's order to be supported by substantial evidence on the record as a whole.
First, this court is compelled to note that we believe McPhillips presented direct evidence of antiunion animus. Godfrey testified that at the conclusion of the mid-February meeting, wherein McPhillips complained about working conditions, demanded union representation, and indicated his intent to assert his statutory and contractual rights by filing a grievance at the end of his ninety-day probationary period, Sewell told him that if he was going to have a problem with McPhillips after his ninety-day probationary period, he did not need it. Sewell then recommended in his probationary report that McPhillips be discharged *Page 515 
because "he stated that he will be even less cooperative after probation." These statements indicate that Sewell recommended discharging McPhillips because he intended to file grievances at the conclusion of his probationary period.
The record also reveals an apparent lack of concern on the part of the school district regarding McPhillips's so-called attitude problem prior to the mid-February meeting. Director of Transportation Malloy testified that approximately two weeks before he received Sewell's February 28, 1986 recommendation that McPhillips be discharged, he received a complaint from Director of Operations James regarding communication problems between driver supervisors and mechanics on the start-up shift and McPhillips's relationship with Mendez. Malloy then informed Sewell of the problem and asked Mendez to provide a written statement regarding the problem. According to Malloy, Mendez failed to produce a written statement per his request. Further, Sewell took no disciplinary action against McPhillips based on Mendez's complaints. It was not until after McPhillips engaged in protected activities that Sewell recommended that McPhillips be discharged because he and Mendez were having problems with him on the lot in the morning. Even more significant, however, is the fact that Malloy testified that when he first learned of these complaints, he did not believe they were serious enough to warrant McPhillips's discharge. Clearly, Malloy terminated McPhillips based on Sewell's recommendation.
The record further reveals that the timing of the discharge was in such close proximity to the protected activity as to warrant an inference of antiunion animus. Approximately one week after Sewell made the statement to Godfrey that if he was going to have a problem with McPhillips after his probationary period, he did not need it, he told Malloy that he intended to recommend in his probationary report that McPhillips be discharged. The following week, Sewell submitted his probationary report to Malloy, who then terminated McPhillips based on Sewell's recommendation.
Moreover, there is also evidence in the record that the probationary report recommending that McPhillips be discharged contained false information. In Sewell's report, he recommended that McPhillips be fired because of his poor attitude and his poor work performance. At the hearing, however, both Sheets and Godfrey praised the quality of McPhillips's work. Indeed, Godfrey thought so much of McPhillips's work that he tried to persuade Sewell and Malloy to reverse the decision to fire McPhillips. This evidence that a false reason was given to support the discharge recommendation also supports an inference of antiunion animus.
Nor are we persuaded, as argued by appellant, that because Malloy was unaware of McPhillips's protected activities, the school district could not have violated R.C. 4117.11(A)(1) and (A)(3). R.C. 4117.11(A) makes it an unfair labor *Page 516 
practice for a public employer, its agents or representatives, to discriminate against an employee for engaging in protected activities. Taken literally, then, R.C. 4117.11 as much outlaws discrimination by an agent of the school district as it does by the school district itself. And, while Malloy himself appears not to have used his position as Director of Transportation Maintenance to engage in discrimination against McPhillips, it is clear that Sewell, as Assistant Maintenance Manager, was the school district's agent with respect to other employees in that department and equally clear that the discrimination charged to Sewell violated R.C. 4117.11(A)(1) and (3) and was attributable to the school district.[3]
Based on the foregoing, this court concludes that the trial court did not abuse its discretion in finding the R.C.4117.11(A)(1) and (A)(3) violations supported by substantial evidence on the record as a whole.
Accordingly, the school district's second assignment of error is overruled.
Judgment affirmed.
JOHN F. CORRIGAN, P.J., and JAMES D. SWEENEY, J., concur.
[1] Article IX, Section 9.5 of the collective bargaining agreement between the school district and the union provides that:
"Each employee shall be responsible for the performance of any task assigned to him by his designated superior. Any other person who wishes to change the duties of said employee shall accomplish this through the employee's superior, except in case of emergencies."
[2] Although the Ohio Supreme Court refers to this causation test as the "in part" test, a virtually identical test has been proposed as an alternative to both the "in part" and the "but for" tests. See Comment, Transportation Management: The Validation of Wright Line (1984), 2 Hofstra Labor L.J. 185, 208-209. This "true purpose" or "actual motive" test distinguishes itself from the traditional "in part" test in that an unfair labor practice may be found only if antiunion animus is determined to be the employer's true purpose or actual motive for disciplining the employee.
[3] We have encountered nothing impugning our reading of R.C. Chapter 4117 as meaning that infractions of R.C. 4117.11(A)(1) and (A)(3) by agents are unfair labor practices attributable to their employers.